## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

UNITED STATES OF AMERICA, ex rel.
DAVID FELTEN, M.D., Ph.D., and
STATE OF MICHIGAN, ex rel. DAVID
FELTEN, M.D., Ph.D

Plaintiff-Relator,

v.

WILLIAM BEAUMONT HOSPITALS,

Defendant.

Civil Action No. 2:10-cv-13440
Jury Trial Demanded

### FIRST AMENDMENT TO COMPLAINT

Plaintiff-Relator David L. Felten (hereinafter, "Relator" or "Dr. Felten")

hereby files the First Amendment to his Complaint.

### <u>INTRODUCTION</u>

1.     Eight years ago, on August 30, 2010, Dr. Felten filed this action under seal,

alleging violations of the False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq*., the

Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)(1)-(1), the Michigan Medicaid

False Claim Act, M.C.L. 400.601 *et seq*. ("Michigan FCA"), and the provisions of

those statutes that protect those who expose fraud against the government from

retaliation, *see* 31 U.S.C. § 3730(h), M.C.L. § 400.610c. In this First Amendment, Relator refers to the complaint that initiated this action as the Original Complaint.

2.      In his Original Complaint, Dr. Felten alleged that Defendant William Beaumont Hospitals ("Beaumont"), a system of healthcare and research facilities in Southeast Michigan, engaged in a fraudulent and illegal kickback scheme to enrich itself at the public's expense, in violation of the FCA, the Michigan FCA, and other applicable law.

3.      On July 31, 2018, Beaumont entered into a settlement agreement with Dr. Felten, the United States of America, the State of Michigan, and others.

4.      In exchange for dismissal of the FCA and Michigan FCA claims that comprised Counts I and II of Dr. Felten's Original Complaint, Beaumont agreed to pay approximately $84.5 million to the United States and Michigan governments.

5.      As a result of that settlement agreement, the United States and Michigan governments dismissed Counts I and II of the Original Complaint.

6.      Dr. Felten now wishes to prosecute Counts III and IV of the Complaint, which allege claims for unlawful retaliation in violation of the anti-retaliation provisions of the False Claims Act, *see* 31 U.S.C. § 3730(h), and Michigan False Claims Act, *see* M.C.L. § 400.610c.

7.      The purpose of this First Amendment is to bring current the retaliation Dr.

Felten suffered as a result of reporting Beaumont's unlawful conduct.

## SUMMARY OF RETALIATION CLAIMS

8.     Prior to his suspension and termination, Dr. Felten served as Beaumont's Vice President for Research and Medical Director of the Research Institute, as well as Associate Dean for Research at the Oakland School of Medicine, which is associated with Beaumont.

9.     Beginning around 2006, Dr. Felten observed and consistently reported to various representatives of Beaumont what he perceived to be fraud, waste, and potentially illegal misconduct within Beaumont.

10.    For some time, Beaumont executives assured Dr. Felten that the misconduct he had reported was being addressed.

11.    But a 2009 report by an outside auditor ("FTI") confirmed that Beaumont's staff, administration, and employees were still engaged in many of the same types of misconduct Dr. Felten had identified.

12.    Moreover, Dr. Felten discovered through his own investigation there appeared to be other serious violations of federal law at Beaumont.

13.     More detailed accounts of the types of unlawful conduct Dr. Felten uncovered and reported are set forth in the August 30, 2010 Complaint, Dkt. 1 ("Original Complaint").[1]

14.     Dr. Felten alerted Beaumont's executives repeatedly and throughout his tenure about the unlawful conduct he observed.

15.     Despite the FTI report and Dr. Felten's ongoing efforts to persuade Beaumont leadership to correct the many fraudulent schemes, it became clear to Dr. Felten that Beaumont had no intention of correcting its misconduct.

16.     In August 2010, Dr. Felten filed this lawsuit.

17.     In the spring of 2011, the United States issued a civil investigative demand for documents to Beaumont, making Beaumont aware that the United States was investigating some of the misconduct Dr. Felten had reported.

18.     Once they realized that Beaumont personnel were cooperating with the federal government, Beaumont administration engaged in a campaign to, in their words, "find the snitch" and "eliminate the mole."

---

[1] *See*, *e.g.*, Original Complaint at ¶¶149 – 208 (Illegal Incentives); ¶¶ 209 – 237 (Cost Reporting Fraud); ¶¶ 238 – 322 (Research Fraud); and ¶¶ 323 – 342 (Theft of Government IP).

19.     By late 2012, Beaumont had likely identified Dr. Felten as the "snitch." Dr. Felten's privileged, personal gmail communications dating from that period with his FCA counsel were later discovered in Beaumont's possession.  Beaumont could not have accessed these emails without searching Dr. Felten's personal possessions or personal account.

20.     In October 2012, Beaumont leadership decided to force out Dr. Felten by generating pretextual bases for his termination.

21.     First, Beaumont's Chief Medical Officer falsely suggested that an internal report indicated Dr. Felten should be replaced.  But the report actually commended Dr. Felten on his excellent performance.

22.     Second, Beaumont's leadership falsely represented to Dr. Felten that he was subject to a mandatory retirement policy at age sixty-five.

23.     Based upon these false pretenses, Beaumont suspended Dr. Felten shortly after his sixty-fifth birthday and terminated him in 2014.

24.     Beaumont marginalized, suspended, and ultimately terminated Dr. Felten in retaliation for his reporting of its unlawful activities and filing of this whistleblower action.

25.     Upon information and belief, Beaumont also interfered with Dr. Felten's ability to obtain substitute employment and mitigate his damages by maligning Dr.

Felten to multiple research institutions across North America, thereby deterring these institutions from hiring Dr. Felten and depriving Dr. Felten of opportunities which would otherwise have been available to him.

26.     Dr. Felten seeks to recover the damages he suffered as a result of Beaumont's retaliation against him for reporting its misconduct.

## <u>JURISDICTION AND VENUE</u>

27.     This Court has jurisdiction over this action under 31 U.S.C. § 3732. This Court also has jurisdiction under 28 U.S.C. § 1331 because this action arises under the laws of the United States.

28.     This Court has supplemental jurisdiction over all other claims set forth in this Complaint because these claims are so related to the federal claims that they form part of the same case or controversy. *See* 28 U.S.C. § 1367.

29.     Venue is proper in this district pursuant to § 3732(a) of the FCA, because at all times material hereto, Beaumont regularly conducted substantial business in the State of Michigan and maintained permanent employees and offices in the State of Michigan, within this judicial district. Additionally, venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1)-(2).

## PARTIES

30.     David Felten, M.D., Ph.D., is a renowned research physician whose contributions to neuroscience helped to establish the field of psychoneuroimmunology. Among other recognitions, Dr. Felten's work earned him a MacArthur Foundation Prize Fellowship, two nominations for a Lasker Prize, and two 10-year MERIT awards from the National Institute on Aging and the National Institute of Mental Health.

31.     Beaumont is a three-hospital system in Southeast Michigan that, at the time this complaint was originally filed, employed approximately 450 full-time physicians, had approximately 2,500 private practitioners with admitting privileges, and ranked second in the nation for the number of Medicare patients provided services.

19.     Beaumont transacts business in Oakland County, Michigan and is subject to the personal jurisdiction of the Court.

## FACTUAL ALLEGATIONS

22.     When he first arrived at Beaumont, Dr. Felten was appointed the Medical Director of Beaumont's Research Institute.

23.     Shortly thereafter, Dr. Felten became the founding Vice President, Research and later the founding Associate Dean for Research, Oakland University William Beaumont School of Medicine.

24.     In these capacities, Dr. Felten served as a member of Beaumont's Leadership Council, its Corporate Medical Leadership Group, its CMO Leadership Group, and its Medical Executive Counsel.

25.     By 2006, Dr. Felten realized unlawful conduct in the form of unlawful kickback schemes was occurring at Beaumont.  He began raising concerns in conversations with Beaumont executives and other representatives.  Although Beaumont executives indicated they would investigate those issues, Dr. Felten perceived no change in Beaumont's policies and practices that led to his initial concerns.

26.     In fact, instead of correcting the issues, Dr. Felten was attacked by several prominent physician perpetrators of these unlawful practices who sought to have him fired. These attacks were directed first to Chief Medical Officer (CMO) Irwin, who had hired Felten, and then to CMO Diokno, who replaced Irwin as CMO and Felten's supervisor.

27.     In 2009, an outside auditor, FTI Healthcare ("FTI"), completed an outside audit report which confirmed that Beaumont's staff, administration, and employees

were still receiving significant kickbacks from Beaumont in exchange for patient referrals.

28. Among other findings, FTI concluded that (1) the work of the equivalent of approximately 132 full-time employee physicians—at a cost of $16.3 million per year—could not be accounted for, and (2) Beaumont had 56 gratuitous medical directorships with virtually no job descriptions, no performance standards, and no evaluations.

29. In June of 2010, at an executive retreat to discuss how to address the misconduct FTI had documented, Dr. Felten described to the entire group what he considered to be misrepresentations of research time on Medicare Cost Reports and Medicare Time and Effort Reports by Beaumont physicians.

30. Specifically, Dr. Felten explained that he had observed research time that was not deducted from these Medicare reports but instead "rolled up" into them, so that the federal government would improperly be reimbursing Beaumont for that work.

31. Dr. Felten's outspoken criticism of Beaumont physician policies led to numerous instances of retaliation by Beaumont executives.

32. For example, each year beginning in 2010 and through Dr. Felten's termination, the Research Institute's budget from Beaumont for the following year

was sliced in half, but Dr. Felten was "expected" to accomplish the same things with half the funding.

33.    Unable to stop the fraud, waste, and abuse that he witnessed and unwilling to be complicit in such corruption, Dr. Felten sought legal counsel and ultimately filed this case on August 30, 2010.

34.    On or about February 23, 2011, Dr. Felten, through counsel, informed the United States Attorney's Office that Beaumont's Chief Operating Officer, Dr. Karen Carbone, had been terminated.  Dr. Felten believed Dr. Carbone was likely terminated in retaliation for her own efforts to report the same instances of unlawful conduct that Dr. Felten had previously reported and which formed the basis of Dr. Felten's whistleblower complaint.

35.    Following Dr. Felten's notification, the United States issued a Civil Investigative Demand (CID) for Dr. Carbone's testimony.

36.    Around the same time, the United States also issued a CID to Beaumont for documents returnable June 1, 2011.

37.    At least by this point, Beaumont was aware that there was an open government investigation into its misconduct.  Beaumont's leadership became openly anxious to find and remove the whistleblower.

38.     During leadership meetings that Dr. Felten attended in mid-2011, he heard high-ranking Beaumont representatives state that, if Beaumont was the subject of a whistleblower lawsuit, they needed to "find the snitch" and "eliminate the mole."

39.     Certain Beaumont officials suspected at that time that Dr. Felten might be the "snitch."

40.     In fact, Dr. Felten overheard Beaumont officials suggest that he might be the whistleblower and that, if he were, the results for Beaumont could be disastrous. Specifically, the speaker said words to the effect of, "can you imagine what would happen if it is someone like David Felten, with all that he knows and all of his paperwork?"

41.     Dr. Felten also recently learned that Beaumont searched his personal belongings during this period without his knowledge, at which point it certainly became aware that he was a whistleblower.

42.     Beaumont had in its possession two printouts Dr. Felten had created in 2012 and 2013 of privileged, personal gmail communications with his counsel.  The only way Beaumont could have accessed this information was through searching of Dr. Felten's personal belongings or personal computer.

43.     Thus, Beaumont had identified Dr. Felten as a whistleblower by late 2012.

44.     Once Beaumont knew Dr. Felten was the "snitch," Beaumont's retaliation efforts increased.

45.     By fall 2012, it was clear to Dr. Felten that Beaumont was seeking to oust him for "interfering" with its plan to "keep the doctors happy" by providing them with kickbacks and other unlawful payments.

46.     At that time, Beaumont hired a friend of its CMO to "evaluate" the Research Institute that Dr. Felten oversaw.

47.     That evaluator conducted two days of interviews with physicians and Beaumont officials who had complained about Dr. Felten's refusal to go along with their illegal practices.

48.     During that interview, the evaluator informed Dr. Felten that the evaluator's assigned task was to look for decisions or judgments Dr. Felten had made that could be used to justify his removal from Beaumont. But the evaluator found none.

49.     Also during that interview, Dr. Felten laid out his concerns about corruption and illegal misconduct at Beaumont.

50.     In his formal report on October 4, 2012, the evaluator stated: "Although I have been around the block a few times, I don't think even I could be successful as [Dr. Felten] without a much stronger degree of support from all levels."

51.     And despite acknowledging that he was tasked with finding justification to oust Dr. Felten, the evaluator concluded that, "[w]hat I am certain of is that if all [Beaumont does] is switch out the leader [of the Research Institute], you will either be back to your current state in a short time or have a happy group of investigators who may put the institution in harm's way. If [Dr. Felten] was in my shop, I would personally mentor him, fully support his position on research ethics and compliance[,] and personally take some of the lumps he is taking on by himself . . . ."

52.     Unhappy with the results of this report, Beaumont leadership decided to distort them.  During a leadership meeting in late October of 2012, with most or all of Beaumont's executives present, Beaumont's CMO distributed a *summary* of this report falsely stating that the evaluator had concluded Beaumont needed to significantly improve its "research leadership"—*i.e.*, to replace Dr. Felten.

53.     Dr. Felten objected to these false claims and requested that the full report be distributed.  But that did not prevent Beaumont from continuing to search for pretextual reasons to terminate Dr. Felten.

54.     Shortly after this incident, in December 2012, Beaumont's CMO falsely represented to Dr. Felten that his position was subject to mandatory retirement at age 65.

- 13 -

55.     Dr. Felten's 65th birthday was on February 27, 2013, just a few months away.

56.     Dr. Felten questioned whether any mandatory retirement policy applied to his position, but the CMO insisted the rule applied to Dr. Felten.  He then stated that Beaumont would "generously" allow Dr. Felten to remain at Beaumont for a few additional months, through June 2013.

57.     Dr. Felten had no plans to stop working at age 65, so he asked whether Beaumont would make an exception to this rule.

58.     The CMO stated that Beaumont's leadership declined to make any exception for Dr. Felten.

59.     Dr. Felten next sent Beaumont a formal written request to extend his tenure from the supposedly-mandatory retirement in early 2013 to December 31, 2014.

60.     The CMO informed Dr. Felten that his written request had been rejected by Beaumont's Board of Directors.

61.     Dr. Felten later learned from Beaumont's Vice President of Human Resources that his position was *not* subject to mandatory retirement, a fact the CMO also admitted when Dr. Felten confronted him with the falsehood.

62.     With the false assertion corrected, Dr. Felten informed both the Vice President of Human Resources and the CMO that he had no intention of retiring that early.

63.     Despite this, Beaumont informed Dr. Felten in December 2013 that his "request" to retire in December 2014 was being "honored."

64.     At that time, Beaumont instructed him to stop work immediately— effectively suspending him—although his salary and benefits would be paid through December 2014.

65.     Dr. Felten explained that he had no desire to retire and that he had only sent his request to extend his tenure through December 2014 when, based on the false representations by Beaumont's CMO, he had incorrectly believed he would be forced to retire ten months before that time.

66.     Beaumont refused to acknowledge this history and moved forward to suspend and terminate Dr. Felten.

67.     In short, Beaumont's suspension and termination of Dr. Felten was based on multiple pretexts—first, based on the false claim that he was subject to mandatory retirement, and then, after he discovered that was false, based on the false pretense of honoring a "request" that he had withdrawn and that Beaumont itself had already rejected.

## <u>BEAUMONT PREVENTS DR. FELTEN<br>FROM MITIGATING HIS DAMAGES</u>

68.     Beaumont's interference with the terms and conditions of Dr. Felten's employment did not end with his suspension and eventual termination.

69.     After Beaumont suspended him, Dr. Felten immediately began to look for other work.

70.     But despite his impeccable resume and distinguished career, Dr. Felten's application was rejected **nearly forty times** by institutions across North America from February 2014 through 2017.

71.     The only plausible explanation for the rejection of Dr. Felten's application by all of these institutions is that Beaumont intentionally maligned Dr. Felten to these institutions in retaliation for his reports of its unlawful conduct.

72.     Dr. Felten eventually secured employment as Associate Dean of Clinical Sciences and Professor of Neurosciences at the University of Medicine and Health Sciences in St. Kitts, at less than half of his Beaumont salary.

73.     Due to the loss of Dr. Felten's salary, he and his wife were forced to sell intellectual property they owned, drain their retirement accounts, and sign up early for Social Security benefits.

74.     Dr. Felten's damages are continuing.

## COUNT III

### Violation of 31 U.S.C. § 3730 – Retaliation

75.     Dr. Felten incorporates and restates the allegations in the previous paragraphs of this First Amendment to his Complaint as if fully set forth herein.

76.     Dr. Felten was an employee of Defendant Beaumont at the time that he alerted Beaumont that its physicians, staff, administrators, and employees were engaged in unlawful conduct in violation of state and federal law.

77.     Dr. Felten was also an employee of Beaumont at the time that he filed this lawsuit alerting the United States and the State of Michigan to the unlawful conduct he observed.

78.     In retaliation for Dr. Felten engaging in the protected conduct of reporting both internally and through this lawsuit the unlawful kickbacks, Medicare fraud, and other illegal activity he witnessed at Beaumont detailed above and in his Original Complaint, Beaumont suspended and ultimately terminated Dr. Felten.

79.     When Dr. Felten raised concerns about the unlawful conduct internally, Beaumont sought to silence him by harassing him; making false statements about his effectiveness as a leader; targeting the institution he ran; and manufacturing pretextual reasons to suspend and ultimately terminate him.

80.     Once it suspected he was a whistleblower, Beaumont sought to force Dr.

Felten out of his job, first by seeking to terminate him under the false pretense that

he was subject to mandatory retirement and then by suspending and ultimately

terminating him under the false pretense that he had asked to resign his position.

81.     Furthermore, upon information and belief, Beaumont sought to prevent Dr.

Felten from finding employment at research institutions across North America in

retaliation for his protected conduct.

82.     Beaumont's actions violated Dr. Felten's rights pursuant to 31 U.S.C.

§ 3730(h) to be protected from being "discharged, demoted, suspended, threatened,

harassed, or in any manner discriminated against" in the terms and conditions of

his employment because of his lawful acts of reporting illegal activity.

83.     As a result of Beaumont's actions, Dr. Felten has suffered damages in an

amount to be shown at trial.

84.     And under 31 U.S.C. § 3730(h), Dr. Felten is entitled to "all relief necessary

to make [him] whole . . . ."

## **COUNT IV**

### **Violation of M.C.L § 400.610c– Retaliation**

85.     Dr. Felten incorporates and restates the allegations in the previous

paragraphs of this First Amendment to his Complaint as if fully set forth herein.

86.    Dr. Felten was an employee of Defendant Beaumont at the time that he alerted Beaumont that its physicians, staff, administrators, and employees were engaged in unlawful conduct in violation of state and federal law.

87.    In retaliation for Dr. Felten initiating, assisting in, and participating in this action under the Michigan False Claim Act, Beaumont sought to force him from his position, and ultimately suspended and terminated his employment because he reported Beaumont's unlawful conduct.

88.    Further, upon information and belief, Beaumont also sought to prevent Dr. Felten from finding employment at research institutions across North America in retaliation for his involvement in this action.

89.    Beaumont violated Dr. Felten's rights pursuant to M.C.L § 400.610c by threatening, harassing, and in other ways discriminating against Dr. Felten because he engaged in lawful acts, including initiating, assisting in, or participating in the furtherance of this action under the Michigan Medicare False Claims Act.

90.    As a result of Beaumont's actions, Dr. Felten has suffered damages in an amount to be shown at trial.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Relator David L. Felten prays for judgment:

(a)  awarding Dr. Felten damages in the form of twice the amount of his back pay, interest on such back pay, compensation for all special damages, and all other

relief to which he is entitled as a result of Beaumont's violations of 31 U.S.C. § 3730(h) and M.C.L § 400.610c;

(b) awarding Dr. Felten his litigation costs and reasonable attorney's fees; and

(c) granting such other relief as the Court may deem just and proper.

Respectfully submitted this 27th day of August, 2018,

/s/ Julie K. Bracker
Julie Bracker
Georgia Bar No. 073803
(Admitted to the E.D. Michigan)
Jason Marcus
Georgia Bar No. 949698
(Admitted to the E.D. Michigan)
**Bracker & Marcus LLC**
3225 Shallowford Road
Suite 1120
Marietta, Georgia 30062
Telephone: (770) 988-5035
Facsimile: (678) 648-5544
Julie@fcacounsel.com
Jason@fcacounsel.com

/s/ Michael A. Caplan
Michael A. Caplan
Georgia Bar No. 601039
T. Brandon Waddell
Georgia Bar No. 252639
**CAPLAN COBB LLP**
75 Fourteenth Street, NE
Suite 2750
Atlanta, Georgia 30309
(404) 596-5600 – Office
(404) 596-5604 – Facsimile

mcaplan@caplancobb.com
bwaddel1@caplancobb.com